UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                    )  Cr. No. ~~04-01671-NG~~<br>)           04cr10083<br>EDWIN RODRIGUEZ                )<br>  AKA "KING CHOLO"              )<br>)  | FILED<br>IN CLERKS OFFICE<br>2005 FEB -1  P 2: 32<br>U.S. DISTRICT COURT<br>DISTRICT OF MASS. |

### SENTENCING MEMORANDUM OF THE UNITED STATES

On October 13, 2005, the defendant, Edwin Rodriguez, a/k/a "King Cholo" (the "defendant" or "Edwin Rodriguez"), pled guilty to (i) conspiracy to distribute more than 5 grams of cocaine base, also know as "crack cocaine", and (ii) distribution of more than 5 grams of crack cocaine.  The Presentence Report prepared by the U.S. Probation Office, dated December 30, 2004 (the "PSR"), properly concluded that the defendant is a career offender, pursuant to U.S.S.G. § 4B1.1, and properly calculated the defendant's Total Offense Level as 31 and his Criminal History Category as VI, generating a sentencing guideline range of 188 to 235 months imprisonment.  The PSR also properly noted that the defendant is subject to a mandatory minimum 5 year sentence.

The only relevant guideline issue in this case is the defendant's status as a career offender.  For the reasons presented herein, the Court should lend heavy weight to the Guidelines calculation of the defendant's sentencing range, and sentence the defendant within that range.  The government

requests that the Court impose a sentence of 188 months, representing the low end of the guideline range. A sentence below 188 months would be unreasonable under <u>United States v. Booker</u>, 2005 WL 50108 (Jan. 12, 2005).

### A.   BACKGROUND

This case arose from an eighteen-month investigation by the Federal Bureau of Investigation's ("the FBI's") North Shore Gang Task Force into drug trafficking and other suspected criminal behavior in the Lawrence and Lowell, Massachusetts area by members and associates of the Almighty Latin King Nation ("Latin Kings"). Over the course of the investigation, cooperating witnesses ("CW's") working for the FBI made approximately 30 purchases of heroin, cocaine and cocaine base from members and associates of the Latin Kings. All of the purchases (and most of the conversations and negotiations leading up to the purchases) were consensually recorded. Most of the deals also took place in a car equipped with audio and video equipment. The CW's also wore transmitters during most of the purchases. The transmitters enabled law enforcement agents to listen to conversations as they took place.

The investigation also disclosed substantial amounts of information regarding the organization and structure of the Latin Kings. <u>See</u> Affidavit of Special Agent Mark Karangekis (Dkt. #3). The Massachusetts Chapter of the Latin Kings is a street gang

with hundreds of members in Lawrence, Lowell and other cities. The Latin Kings operate local chapters throughout the state including chapters inside many correctional facilities. Many members of the gang are involved in a broad range of illegal activities including drug trafficking and crimes of violence undertaken in furtherance of protecting the interests of the gang and its members. See generally id.

At the outset of the investigation, information from confidential sources indicated that Edwin Rodriguez was a blessed member of the Lawrence Chapter of the Latin Kings and that his brother, co-defendant Josue Rodriguez, a/k/a "Perro", is a member of the Immortal Outlaws, another Lawrence-based street gang traditionally aligned with the Latin Kings. Id. ¶ 56.[1] Confidential and law enforcement sources indicates that the Rodriguez Brothers operated a drug trafficking business out of 16/18 Springfield Street in Lawrence, a location known from prior federal gang investigations and from Lawrence Police Department investigations as a location where Latin King and other gang members congregate and as a major distribution point for drug activity by Lawrence gang members. See, e.g., id.

---

[1] Edwin Rodriguez has approximately 12 tattoos, including an "angel of death", a skull, and an "LK" on his shoulder. PSR ¶ 84. The defendant stated that the "LK" indicates he was a member of the Latin Kings but claimed that he is no longer a member of the gang. Id.

On December 5, 2003, in connection with the Latin King investigation, a cooperating witness working with the FBI (the "CW") made a hand-to-hand purchase of 13.2 grams of cocaine base, also known as "crack cocaine", from Edwin Rodriguez and Josue Rodriguez. The sale were surveilled by law enforcement agents and recorded on audio and video tape.

### B. THE 12/5/03 SALE OF 13.5 GRAMS OF "CRACK COCAINE" BY EDWIN AND JOSUE RODRIGUEZ

On December 5, 2003, the CW made a consensually recorded call to Edwin Rodriguez who agreed to sell the CW 14 grams of crack cocaine for $450 (the price was later changed to $550). The CW picked up Edwin Rodriguez in a car equipped with audio and video surveillance and they engaged in the following exchange (the conversation was in Spanish and was translated by Detective Richard Brooks of the Lawrence Police Department, who is fluent in Spanish):[2]

| | |
|---|---|
| THE CW: | Does PERRO have it?[3] |
| EDWIN RODRIGUEZ: | PERRO will get it like that [snapping his fingers.] Because he's always getting it for his white customers. He has some white people that are always buying rocks [i.e., crack cocaine] and Manteca [i.e., heroin]. It's a fourteen [i.e., fourteen grams] what you want? |
| THE CW: | Yeah! |

---

[2] A copy of the draft transcript from the 12/5/03 buy is attached as Exhibit 1 ("Transcript").

[3] JOSUE RODRIGUEZ's street name is "PERRO".

4

EDWIN RODRIGUEZ:     That's what I told PERRO last night because he was with me.

Under surveillance, the CW and Edwin Rodriguez then drove to Josue Rodriguez's home at 40 Bennington Street, #3, in Lawrence.[4] The crack deal took some time to arrange. While they waited in the car, the CW and Edwin Rodriguez had a conversation that was recorded on audio and videotape. Among other things, Edwin Rodriguez said that the "other day" his friend was selling him "a nine and a forty, both for eight hundred dollars" (i.e., a nine millimeter handgun and forty caliber handgun). Transcript at 2. The CW asked Edwin Rodriguez if he could set him up with a gun and Edwin said he would look into it.[5]

At one point, the CW and Edwin Rodriguez engaged in the following exchange.

EDWIN RODRIGUEZ:     Do you have the money?

THE CW:              Yea. I'll give you the money after you tell me how much its going to be.

EDWIN RODRIGUEZ:     $450 so we both can make some money.

THE CW:              I have to weigh it with the scale.

EDWIN RODRIGUEZ:     No, some times he brings it with two

---

[4] During the drive, EDWIN RODRIGUEZ told the CW that he had a .40 caliber and a .45 caliber gun to sell and they arranged for the CW to buy both guns the following week for $800. This buy never took place.

[5] After the 12/5/03 drug buy, agents never attempted to have the CW buy a gun from Edwin Rodriguez, instead turning their focus on the other 20 odd Latin King members who were eventually charged in connection with this investigation.

5

>extra lines, or three.  PERRO and
>VICENTE use to sell for him and they
>would take from him ounces, half ounces
>and half kilo . . . that old man is like
>that, he would give my brother anything
>he wanted.

Transcript at 3.

Edwin Rodriguez also talked about robbing another drug dealer of two pounds of marijuana, saying that they waited until he went to sleep and broken into his car.  Transcript at 2.  Edwin Rodriguez also said that he used to sell heroin in Manchester, New Hampshire, and that he sells heroin for $80 per gram.  Id. at 1-2.

During this recorded conversation, Edwin Rodriguez also talked about how he and "PITO" had beaten down two men in the Middleton Jail.  Id. at 3.  He also said that he had a connection for ecstasy who gets 1,200-1,500 pills at a time, at $6 per pill, and sells them for $15 per pill.  Id.  While they waited in the car, Edwin Rodriguez also talked about a man that he punched and about hitting his girlfriend.  Id. at 4.  Edwin Rodriguez then told the CW that a drug dealer offered him $25,000 to break the legs of the drug dealer's girlfriend; Edwin said that he looked for the girl but could not find her.  Id.  Edwin Rodriguez also told the CW that he could cook the cocaine at his house.  Id.

Edwin Rodriguez got out of the car at Josue's house and whistled up to Josue Rodriguez.  Edwin Rodriguez can be heard on tape saying to the CW:  "He's coming down.  Do you have the

6

$550?" The CW said "yeah", and Edwin Rodriguez can be heard on tape saying: "PERRO deals with everyone. He has some customers from New Hampshire that come down and buy $1,000 worth of drugs. One of the guys gave me $150 after the deal. Everyone trusts PERRO." Transcript at 4.

Moments later, Josue Rodriguez and an unidentified male came out of 40 Bennington Street and got in the backseat of the CW's car. Immediately thereafter, Edwin Rodriguez can be heard saying: "Talking about PERRO and PERRO is here drinking a beer." The CW and Josue Rodriguez can be heard engaging in the following exchange:

| | |
|---|---|
| THE CW: | Damn, you told me $450 and now it's $550. |
| JOSUE RODRIGUEZ: | I don't know anything about that. I thought the guy was going to give it to me cheaper. |
| THE CW: | What happened with the Ecstasy? |
| JOSUE RODRIGUEZ: | I forgot about the connection! I can get whatever you need, anything, anything. |

Transcript at 4.

Later, the CW turned on the inside light of the car and gave the $550 in OGC to Edwin Rodriguez who handed it through the window to Josue Rodriguez (who had gotten out of the backseat and was standing at the front passenger side Window). Josue Rodriguez then went into 40 Bennington Street and came back less than a minute later and got into the backseat and handed the

7

crack cocaine up to Edwin Rodriguez, who handed it to the CW. The unknown male got out of the car. When he got the crack, the CW immediately removed the paper and weighed it and said that it weighed 14.4 grams. Josue Rodriguez can then be heard saying "so give me some more money", which the CW refused.

C. **THE BOOKER DECISION**

In the first part of its decision in Booker, the Court held that the mandatory nature of the violated the defendant's Sixth Amendment right to a jury trial by requiring judges to find facts which in turn increase a defendant's sentence beyond what could be imposed based solely on the jury's verdict. Booker, 2005 WL at *14. See also United States v. Wilson, 2005 WL 78552 at *1 (D.Utah) (Jan. 13, 2005).[6] In the second part of its decision, the Court held that, by severing the two provisions of the Sentencing Reform Act of 1984 (the "Sentencing Reform Act") that make the Guidelines mandatory, the rest of the sentencing scheme contained in the Sentencing Reform Act and the Guidelines could

---

[6] On the day after the Court decided Booker, Judge Cassell of the United States District Court for the District of Utah issued a comprehensive and detailed decision applying Booker. See United States v. Wilson, 2005 WL 78552 (D.Utah) (Jan. 13, 2005). Wilson is particularly instructive in this case because it also involved application of the career offender provision of the guidelines. As summarized below, the Wilson court concluded that "in all future sentencings, the court will give heavy weight to the Guidelines in determining an appropriate sentence" and "will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at *1. Applying these principles, the court sentenced the defendant at the low end of the Sentencing Guideline Range. Id.

be preserved. Booker, 2005 WL at *16; Wilson, 2005 WL at *1.[7] "So modified," the Court continued, "the Federal Sentencing Act . . . makes the Guidelines advisory." Booker, 2005 WL at *16.

Significantly, the Booker Court struck only the two provisions of the Sentencing Reform Act mentioned above. The Court explained that Congress would have wanted "to maintain *all* provisions of the [Sentencing Reform] Act and engraft today's constitutional requirement onto that statutory scheme." Booker, 2005 WL at *27 (emphasis added). The Court therefore severed a provision rendering the Guidelines mandatory -- 18 U.S.C. § 3553(b) -- but left in place the adjoining provision -- § 3553(a). Section 3553(a) lists the general purposes of sentencing and directs that sentencing courts "*shall consider*" certain factors when imposing sentence, including "the kinds of sentence and the sentencing range established" by the Guidelines. 18 U.S.C. § 3553(a).

According to Booker, this provision "*requires* a sentencing court to *consider* Guidelines ranges . . . but it permits the court to tailor the sentence in light of other *statutory* concerns as well." Booker, 2005 WL at 16 (emphasis added). Booker also

---

[7] Specifically, the Court held that 18 U.S.C. § 3553(b)(1) and 18 U.S.C. § 3742(e) were "incompatible" with the Court's holding; the former provision stated that courts "*shall* impose a sentence . . . within the range" established by the Guidelines and the latter provision mandated a *de novo* standard of review which the Court found depended upon the Guidelines' mandatory nature. Booker, 2005 WL at *16; Wilson, 2005 WL at *1.

9

directs courts to abide by the other provisions of the Sentencing Reform Act:

> Without the "mandatory" provision, the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals . . . . The Act . . . requires judges to consider the Guidelines sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant, the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. And the Act . . . requires judges to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care.

Id. at 24 (internal quotations omitted).

Finally, Booker held that, because the Sentencing Reform Act continues to provide for appeals from sentencing decisions, sentences imposed by district courts must be reasonable in light of the factors set forth in the Sentencing Reform Act, including the recommended Guidelines sentence. Id. See also Wilson, 2005 WL at *2 (noting that, while the Guidelines are no longer mandatory, the rest of the Sentencing Reform Act is and the remaining provisions of the Act require the court to consider the Guidelines in determining the sentence").

Booker did not explicitly instruct sentencing courts as to how much weight they should accord the Guidelines (the issue was not presented). The Wilson court properly concluded that the logical inference of Booker is that sentencing courts should

accord heavy weight to the Guidelines. As explained below, this is particularly true when dealing with the career offender provision of the Guidelines because of the unique, statutory mandate attendant that provision.

### D. THE COURT SHOULD GIVE "HEAVY" WEIGHT TO THE SENTENCING GUIDELINES GENERALLY

In Wilson, the court conducted a comprehensive review of Booker and the Sentencing Reform Act, and concluded that "in all future sentencings, the court will give heavy weight to the Guidelines in determining an appropriate sentence" and "will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Wilson, 2005 WL at *1. In support of this conclusion, the Wilson court reasoned (in summary) as follows.

> The Sentencing Reform Act requires the court to impose sentences that "reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, [and] protect the public." The court must also craft a sentence that "afford[s] adequate deterrence to criminal conduct" and "protect[s] the public from further crimes of the defendant." Finally, the court should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Over the last 16 years, the Sentencing Commission has promulgated and honed the Guidelines to achieve these congressional purposes. Congress, too, has approved the Guidelines and indicated its view that Guidelines sentences achieve its purposes. Indeed, with respect to the congressionally-mandated goal of achieving uniformity, the Guidelines are the only way to create consistent sentencing as they are the only uniform standard available to guide the hundreds of district judges around the country. Therefore, in all future sentencings, the court will give heavy weight to

11

> the Guidelines in determining an appropriate sentence.
> In the exercise of its discretion, the court will only
> depart from those Guidelines in unusual cases for
> clearly identified and persuasive reasons.

Id. at *1 (internal citations omitted).

The essential premise of Wilson is that the discretion authorized by Booker "must . . . be exercised by the court so as to comply with additional congressional mandates." Id. at 3. The court explained:

> Even as modified by Booker, the Sentencing Reform Act
> continues to direct that "[t]he court shall impose a
> sentence sufficient, but not greater than necessary, to
> comply with the purposes set forth" in the Sentencing
> Reform Act. Those purposes are:
>
>> (A) to reflect the seriousness of the
>> offense, to promote respect for the law, and
>> to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal
>> conduct;
>> (C) to protect the public from further crimes
>> of the defendant; and
>> (D) to provide the defendant with needed
>> educational or vocational training, medical
>> care, or other correctional treatment in the
>> most effective manner . . . .
>
> In light of the congressional command that the court
> "shall" impose a sentence that is sufficient "to comply
> with the[se] purposes," the court must impose a
> sentence that achieves, for example, "just punishment"
> for an offense and which "afford[s] adequate deterrence
> to criminal conduct."

Id. at *3 (quoting 18 U.S.C. § 3553(a)(2)) (other citations omitted).

The Wilson court concluded that Guideline sentences generally achieve the Congressionally-mandated purposes of

punishment. Id. at *3-4 (reasoning that the best way to determine what particular sentence achieves such things as "just punishment" and "adequate deterrence" is to look to the Sentencing Guidelines). In support of this conclusion, the court reviewed the history of the Sentencing Commission[8] and the Sentencing Guidelines, and reasoned as follows:

> Congress' creation of the Commission and subsequent approval of the Commission's Guidelines provide strong reason for believing that Guidelines sentences satisfy the congressionally-mandated purposes of punishment. It would be startling to discover that while Congress had created an expert agency, approved the agency's members, directed the agency to promulgate Guidelines, allowed those Guidelines to go into effect, and adjusted those Guidelines over a period of fifteen years, that the resulting Guidelines did not well serve the underlying congressional purposes. The more likely conclusion is that the Guidelines reflect precisely what Congress believes is the punishment that will achieve its purposes in passing criminal statutes.

Id. at *4.[9]

---

[8] The court noted: "When it passed the Sentencing Reform Act, Congress created the Sentencing Commission. The Commission is an expert agency specifically designed to assist the courts in imposing sentences that achieve the purposes of punishment." Id.

[9] The Wilson court also noted that, in the recently adopted "Feeney Amendment," Congress "reconfirmed . . . its expectation[] that courts follow the Guidelines." Id. at *4. The court noted:

> In 2003, Congress passed the Feeney Amendment to the Act, which was designed to address what [it] called "the serious problem of downward departures from the Federal Sentencing Guidelines by judges across the country." The Feeney Amendment was meant to "put strict limitations on departures by allowing sentences outside the guidelines range only upon grounds specifically enumerated in the guidelines as proper for departure. This would eliminate ad hoc departures

13

The <u>Wilson</u> court also concluded that the Guidelines "generally achieve 'just punishment,' and . . . crime control purposes." <u>Id.</u> at *5-7 ("[t]he concept of 'just punishment' requires the court to consider society's views as to appropriate penalties, not just a judge's own personal instincts"). Most importantly, the court recognized that the Guidelines should be followed (except in the most unusual circumstances) to "avoid unwarranted sentencing disparities." <u>Id.</u> at 12.

> A final reason for giving heavy weight to the Guidelines to avoid unwarranted sentencing disparity. Avoiding unwarranted sentencing disparity was the main goal of the Sentencing Reform Act. The Guidelines were primarily formulated to "eliminate the unwarranted disparities that proliferated under the prior sentencing regime and to foreclose the consideration of race, gender, and other illegitimate factors at sentencing." As <u>Booker</u> explains, Congress' "basic statutory goal in enacting the Guidelines was to provide a sentencing system that diminishes sentencing disparity" and "to move the sentencing system in the direction of increased uniformity." In an effort to achieve this end, "Congress directed the [Sentencing] Commission . . . to provide certainty and fairness in sentencing and avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted."

<u>Id.</u> at 11 (citations omitted).

---

       based on vague grounds, such as `general mitigating circumstances.'"

<u>Id.</u> *5.

The court continued:

> While <u>Booker</u> renders the Guidelines advisory, the court is still obligated to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct . . . ." The only way of avoiding gross disparities in sentencing from judge-to-judge and district-to-district is for sentencing courts to apply some uniform measure in all cases. The only standard currently available is the Sentencing Guidelines. If each district judge follows his or her own views of "just punishment" and "adequate deterrence," the result will be a system in which prison terms will "depend on 'what the judge ate for breakfast' on the day of sentencing" and other irrelevant factors. Such a result would be intolerable in a society committed to the rule of law and to equal treatment of offenders regardless of race, class, gender, or geographical location. It would, in short, be a return to the pre-Guidelines days, which "produced astounding disparities among the sentences that were imposed on defendants convicted of the same offense with similar backgrounds with different judicial districts across the country--and even among different judges in the same district."

<u>Id.</u> at *12 (citations omitted).

The only way for sentencing courts to satisfy the statutory directive to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), is to accord heavy weight to the Guidelines and presumptively apply the Guidelines. Indeed, under <u>Booker</u>, sentencing courts that impose a sentence outside the applicable, advisory Guidelines range must state "with specificity" both at sentencing and in the written judgment and commitment order its reasons for doing so. 18 U.S.C. § 3553(c).

Based on all these considerations, the court in <u>Wilson</u> sentenced the defendant, who, like Edwin Rodriguez, was a career offender under the Sentencing Guidelines, to a sentence at the low end of the applicable Sentencing Guideline Range.

### E. **THE COURT SHOULD GIVE PARTICULARLY HEAVY WEIGHT TO THE CAREER OFFENDER PROVISION**

The career offender provision of the Guidelines is unique and should be accorded particularly heavy weight by sentencing courts. The Sentencing Commission promulgated the career offender provision pursuant to a clear and specific Congressional policy declaration which was embodied in statute. In 28 U.S.C. § 994, entitled "Duties of the Commission", Congress directed the Commission to create a guidelines provision that would ensure that a certain, defined category of repeat offenders (so called "career offenders") would be sentenced to a term of imprisonment at or near the maximum term authorized.

Section 994 directed the Commission as follows:

(h) The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and--

>    (1) has been convicted of a felony that is--
>
>       (A) a crime of violence; or
>
>       (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C.

16

>    952(a), 955, and 959), and the Maritime Drug Law
>    Enforcement Act (46 U.S.C. App. 1901 et seq.); and
>
>    (2) has previously been convicted of two or more prior felonies, each of which is--
>
>    (A) a crime of violence; or
>
>    (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.).

28 U.S.C. § 994(h).

In light of this Congressional directive, the Sentencing Commission promulgated the career offender provision of the guidelines -- U.S.S.G. §4B1.1, which essentially mirrors 28 U.S.C. § 994(h). Accordingly, this Court should accord particularly heavy weight to the guideline sentencing range in this case (188 months to life) because it is based so clearly on both the Congressional and Commission view that career offenders should be sentenced to a term of imprisonment at or near the maximum allowable.

**CONCLUSION**

For the foregoing reasons, a sentence at the low end of the Sentencing Guideline Range is reasonable and a sentence below that range would be unreasonable. The government therefore requests that the Court sentence the defendant, Edwin Rodriguez, to a term of imprisonment of 188 months, representing the low end of the Sentencing Guideline Range.

                                        Respectfully submitted,

                                        MICHAEL J. SULLIVAN
                                        United States Attorney,

By:  /S/ PETER K. LEVITT
      PETER K. LEVITT
      Assistant U.S. Attorney
      One Courthouse Way
      Boston, MA 02210
      (617)748-3355

February 1, 2005

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served a copy of the foregoing document by facsimile and hand delivery on Paul Markham, Esq., counsel for Edwin Rodriguez.

_____
PETER K. LEVITT
Assistant U.S. Attorney